Good morning, Your Honors, and may it please the Court, I am Assistant Attorney General Eldon Malamuth here today on behalf of Appellant and Cross Appellee. This Court should reverse the District Court's grant of habeas relief because petitioner's allegations do not meet the high standard applicable to constitutional claims based on alleged state court evidentiary errors. With respect to the cross appeal, this Court should affirm the District Court's judgment that the evidence in this case, which included eyewitness testimony, the confession of an accomplice and corroborating physical evidence was sufficient to uphold petitioner's conviction of murder resulting from the attempted robbery of the Burrito Express restaurant. I have to say, Mr. Malamuth, it's hard for me to imagine a case with thinner evidence. Looking at the pictures of the green jacket that you think are corroborating, I'm not sure I see it that way, and there isn't really. The best you have for his confession is actually the hearsay hotelling statement in Omaha. You don't have anything else. Mr. Malamuth Well, Your Honor, first of all, there is... Ms. Brooks It's two things. It's hotelling and it's the jacket. That's it. Mr. Malamuth Well, there are additional items, Your Honor. There is the statement by another accomplice, David Collette, that at his sentencing hearing, his plea hearing, where he implied that he had responsibility for the crimes. Ms. Brooks Right. I saw that statement. And, you know, he says, I'm very sorry. And it doesn't actually say Mr. Smith did anything. Maybe you're reading a lot into that. I am not sure it can bear the weight that you're trying to put on it. Mr. Malamuth Well, Your Honor, we need to, of course, make inferences in favor of the state and for the prosecution. We must view all the evidence in the light most favorable to the prosecution. Ms. Brooks But that doesn't mean jumping over five or six logical steps. I mean, of course, that's the perspective. Jackson against Virginia has held that for many years. But the state seems to be of the view that Mr. Smith loses unless he can prove beyond a reasonable doubt that the DeSeco people did it. But that's not the Jackson standard. Mr. Malamuth No, Your Honor. Ms. Brooks Jackson says it's his duty to raise a reasonable doubt about his involvement. Maybe it was the DeSeco group. Maybe it was somebody else. You know, I don't. Mr. Malamuth That's right. Ms. Brooks That's a different thing. But he didn't have the burden of proving it was the DeSeco group. Mr. Malamuth No, absolutely. The burden of proof at the state court trial was on the prosecution. Now, of course, we are not retrying the petitioner at this juncture. At this juncture, what we are doing is applying two levels of deference, but turning toward the specific back to collect specific statement first. He didn't just say, oh, I'm sorry. He said, you know, it wasn't supposed to turn out this way. If I had known it was going to turn out this way, I would have done something different. So it's not quite right that he simply says, I'm sorry for your, you know, that you had a loss. So there is certainly an implication. Ms. Brooks You see that statement as tying in Mr. Smith as opposed to Collette saying something about his own responsibility. Where do we get Mr. Smith out of that statement? Mr. Malamuth Well, the whole issue in this case, is whether group A did it or group B did it. Ms. Brooks Well, that's what I'm saying. Mr. Malamuth It's not really. It's the issue is, is there proof beyond a reasonable doubt that Smith, perhaps with hoteling and maybe a little bit more remotely with Collette and the other person did it? Ms. Brooks Is it your position really that once a jury has ruled in a case that EDFA deference means that it's just categorically impossible to meet the Jackson versus Virginia standard? Mr. Malamuth Well, no, it's not categorically impossible, Your Honor, but it is difficult. And here we have hoteling statement. We have the confession by an accomplice made multiple occasions, which included facts that were Ms. Brooks You're talking about hoteling's confession, which is mixed up, actually. Mr. Malamuth Well, Your Honor, the confession doesn't have to be perfect to be used as evidence. Ms. Brooks Of course not. Of course not. But when we're evaluating its compelling nature, tell me what was in his confession that was not publicly known or fed to him? Mr. Malamuth Well, he testified that only the petitioner carried the gun, that he didn't carry a gun, and that it was also a little .22. Ms. Brooks So that was where he identified the wrong kind of gun? Mr. Malamuth Well, he described it correctly. And then there was one was a revolver and one was a separate kind of gun. He picked the wrong one. But he did first, excuse me, identify it correctly. Ms. Brooks He picked the automatic, which is a very different gun than a .22 revolver. Mr. Malamuth He pointed to that picture, correct, after describing it as a little .22. Mr. Malamuth I interrupted you in the response to Judge Wood's question. Please continue. Mr. Wood Sure. So we have Hodling's confession. We have the distinctive green jacket. Mr. Malamuth The question was, what was in Hodling's Omaha statement that was correct, non-public, and not fed by the police? Mr. Wood Well, again, there was the fact that I believe the petitioner carried, only petitioner carried the gun. It was a little .22. There was also the testimony, I believe this was not public at that juncture, which, and he directly described where he had run after the crime to the, which way he had run out of the restaurant. And so there was those pieces of evidence. But separately, even aside from the might have been leading questions, once again, there still was the confession, which, you know, in which he confessed, and which was consistent then with Collette's statement. We also have the striking resemblance that the sketch from Pardo's description. Ms. Baird I did not find that so striking, that you have Highland, who's young, you have Hodling, you know, these sketches, and actually other problems with the sketches and the descriptions. I wonder if we could focus on this evidence that was excluded. I want to get to the heart of the district court's opinion. I was very troubled by the exclusion of the information that Briseno kept cash and cocaine at the Burrito Express. And I know that there are some pictures of the Burrito Express in the record. This is not some place that screams out, there's going to be money here. It's a little tiny burrito stand with two tables inside it. And the jury is deprived of finding out that the other group, the group B that you're talking about, the DeSico group, had an association with that place, had a reason to go there. I mean, in our drug cases, of which we see far too many, we always hear the police saying that money and drugs are found together. I'm very troubled at the exclusion of that evidence and its importance in showing motive of one group and lack thereof of the other. Well, Your Honor, the petitioner was allowed to present evidence that he, that the members of the DeSico group had told others that they had went to the Burrito Express restaurant to rob it in order to get money to purchase drugs. This was exactly what the motive that they had ascribed, and they were allowed to present testimony from multiple witnesses regarding this exact motive. But there's more to it. I mean, that might be their hope, but there are probably a hundred restaurants in the area they could have done the same thing with if they wanted money. Anderson would have said that in the week before LeVand went with him to the Burrito Express to buy drugs and that Roseno was a source of high-quality cocaine. There was meat on the bones, and the state certainly was more than happy to give all the circumstances of Hotaling's confession in Omaha. I just don't see the jury getting the full story about the strength of the motive evidence on this side. Just wanting to rob someplace to get money, okay, fine. That's, as far as it goes, that's fine. But this is very meaningful evidence. A few points, Your Honor. Again, this was the motive actually ascribed by the witnesses, by the DeSico group. They said, they told their friends, we were going for this reason, and they were allowed to present such testimony. But the corroborating information about the relationship, the fact that Anderson had already done this, they knew there was going to be more money than usual, a jury could have inferred, at the Burrito Express, whereas we don't have anything that links Smith and Hotaling to it. It's not just that the drugs may have been there, that they were going to steal drugs. It's the they could have expected more money to be there. And it seems here, I think you would agree, when identity is really in question, that motive evidence is often key. Motive evidence can be key, Your Honor. And again, Petitioner was able to present the relevant motive evidence. In this case, the idea that the motive evidence with Anderson was central is also belied by the fact that it didn't even come out. It wasn't a part of the second trial. We hadn't even heard from this Patrick Anderson fellow. I don't know why that's relevant. It's Proffert at the trial whose results are now before us. And this case, of course, had a long history. And well, it's just the evidence that he wanted in Anderson's testimony would in no way have been cumulative. It gives important additional details tying the DiCicco group to this particular place, to this particular victim, all of that. And we have, of course, we have a gun that's associated with the DiCicco group that can't be ruled out as the gun in question. It's the same type. One of the bases, just to pick up on the same line of questioning, one of the bases that the state court gave for keeping out this motive evidence is that it would have been confusing to the jury. How could that have been confusing to the jury? Your Honor, so with respect to the matter of confusion, again, this evidence with respect to the undercover officer and with respect to the officer who had, so one piece of evidence was the evidence of- Well, the evidence, I think we can lump it together. I'll just say that the evidence of drugs being sold out of the Burrito Express, which would suggest that there's going to be cash there through, there might be drugs there as well, but there's going to be cash there. So all of that evidence, the trial court or the Wisconsin court said that would have been confusing to the jury. That was a basis for keeping it out. It would have been confusing to the jury because there would have been a whole mini trial with evidence about Briseño's drug dealing without evidence that the DiCicco group had actually stated to anyone from their confessions that they wanted to steal from Briseño. But why is it though not central that Briseño's drug dealing, because that's why this drug using group thinks this is a ripe target for the money, maybe even the drugs, but they're roughly the same thing and they have a preexisting relationship with Briseño. That's what it shows. Well, so first, Your Honor, the evidence would have been, first of all, some of the evidence would have been that the officer who searched it didn't actually find any drugs there. Another testimony, well, the dog alerted to possible presence of drugs. They didn't find any drugs there. It absolutely does. And the testimony would have been from an undercover officer that whenever he went to speak to Briseño about drugs, Briseño told him to go speak to this other gentleman by the name of Serge or Sergio. So that evidence is certainly not central. That sounds like a comfortable conversation. Hey, if you want the drugs, go to my buddy Serge. Sure. But again, the- Even if you're right that there might have been scraps of evidence that would have supported this verdict, I'm not sure you are right, but maybe let's give you that. We have to have confidence in the verdict. We have to make sure that the state court's decision was not objectively unreasonable. That's right. We have to make- we have to determine that it was that this was harmless, if it was indeed error, that there was indeed more than a reasonable possibility that the outcome, that this made a difference. We have to find actual prejudice. Undermine your confidence in the verdict. It's not preponderance or anything. It's not more likely than not. It's just undermine your confidence. Right. But the Supreme Court says that a fair-minded jurist could not find, could not disagree as to whether there was more than a reasonable possibility that this inclusion of this evidence made the difference. And again, we have the issue of Anderson, who is a career criminal showing up 10 years after the fact, describing incidents that have tangential relevance. He never would have said- And I guess another thing before you run out of time, I'd like you to address is the plethora of confessions we have from the DiCicco group people over and over again. Well, one thing to note about those, that plethora of confessions is how unconvincing they really are. So they, for instance, switch stories, sometimes even within the same telling, they are inconsistent with the physical evidence and the eyewitness testimony. So for instance, DiCicco herself, in the same 2006 statement, first says that Highland and Levand, the members of the DiCicco group that had allegedly committed a crime, first she says they were wearing ski masks. Then when asked, well, why did you say if they're wearing ski masks, why did they have to wipe off the blood from their faces? She says, oh, actually, Highland was wearing a scarf. And so in the exact same statement, not only does she change her story, but she changes her story in such a way that is inconsistent with Pardo's statement that they were wearing ski masks. So another example- That those ski masks and scarf are different, but I don't think that the differences with the jackets are any greater or less than that. And you brush them off as inconsequential. The difference in a black, small black embellishment in a jacket, if you look at the jacket- I looked at the pictures of the jackets, they look quite different to me. I'm sorry, I know what looks, the description versus the jacket itself? Versus the actual jacket with the black all over it and the, you know, the flaps, the two pocket flaps, the other flap. Your Honor, one thing to remember also is that Pardo is holding the man in the green jacket from behind. So his description of the back of the jacket is going to be probably better, makes more sense for it to be more accurate than from the front. But again- You could say that given what was going on. I don't think he's really focusing on the jacket when he's got somebody with a gun shooting and the other person who just came in to rob him. I'm not sure that's going to be his focus. Your Honor, he's holding the assailant in a full Nelson. So the jacket would be right there in front of him, walking him back. But worried about another guy out there with a gun. I don't think he's going to be staring at the details of a jacket. Sorry if I talked over you, Your Honor. He's first walking him back and then the man with the gun shows up, which helps to also explain why the description and the sketch of Hodling is so much more accurate than perhaps the sketch of Petitioner because Petitioner is farther away. Sketch of Petitioner. Unfortunately, I think you're going to have to wrap up, Mr. Malliot, although I'll give you a minute to rebut at the end. Excuse me, but if I could just follow up on one point that hasn't been addressed yet, particularly with respect to the DeSico groups, the evidence of their various confessions to friends and family. My recollection is that the state at this third trial attacked the evidence of those confessions as, in essence, bragging and pleas for money, primarily. And I'm concerned about the other major evidence excluded here, which is the evidence of Hyland's confession to a lawyer in a restaurant, a lawyer he had not met before. And from the transcript, I was kind of mystified by the reason for keeping it out and seems like it would be awfully strong evidence to counter the state's parrying of the other DeSico groups' confessions. Well, Your Honor, with respect to the Hyland confession, again, the Petitioner put on lots of evidence of Hyland's confessions and the detail that a lawyer was present for one of the confessions doesn't really add anything because his friend, Daniel Trumbull, was still present at this confession. Why do you attach such significance to that, though? I mean, the friend found the lawyer for him. Well, exactly. So there's nothing really to take from the fact that he didn't seek out a lawyer. His friend sought out a lawyer for him. They met at a public restaurant where anyone could overhear. He was, what, 15 years old? I think he was older than that, but he was young. The point is, and then any, if he, was he going to lie to his friend or concede that he had been lying to his friend? That's certainly nothing we might expect from a teenager who's bragging. Did he confess to an officer of the court that you committed felony murder? He's a defense attorney, Your Honor. And so, again, there's, who told him there's really no potential, he wasn't worried about potential prosecution because other people had already been arrested for the crime. And so there wasn't much, if anything, added by the presence of the attorney. But as Your Honor mentioned, I've run out of time, and so I will save the rest for a bottle and ask that this court reverse the judgment of the district court. Thank you. All right, so who's going first? Ms. Siliberti or Mr. Jimenez-Ekman? Your Honor, that would be me. All right, let's carry with. May it please the court, counsel, first of all, let me thank you for allowing us to split this between us for pedagogical and other reasons. My name is David Jimenez-Ekman, and I would like to address the cross appeal, that is, Mr. Smith's appeal from the denial of the portion of the habeas petition that asks for his immediate release without retrial. I have, of course, a prepared spiel, but I can see that the court is very familiar with the record, and I'm very happy to see that. So obviously, my most important job will be to answer any questions. But if I could start with one of the questions that you put the state to, Judge Wood, about what in Mr. Hodling's May 2001 statement was not fed to him, accurate, and so on. And you've probably seen the chart, and this is in the record. It's Smith 191, and we've dissected the statement and gone through and demonstrated that, in fact, there's nothing there. And the one thing that the state came up with here, if I can refer you to the transcript of that statement, and that is, it's document number 1-19. The investigator asks, okay, and where did you run when you ran out of the restaurant? Are you familiar with that area? Answer, no, I'm not. Question, okay, did you run behind another building? Answer, I honestly can't even remember. Question, did you run towards the busy street, Route 120, or did you run towards the side street? Answer, if I'm thinking correctly, the side street, not the busy one. Your Honors, even when pressed to name one thing, one thing in the statement that was accurate, given the rest of the evidence, that was not fed to him, the state was unable to do that. So, Mr. Jimenez-Ekman, let me tell you the one thing that really has me thinking about your cross-appeal, and that is this. We do have Hodling's statement, and it implicates Smith, and so I ask myself, even putting this jacket to one side, which I'm not blown away by, but I ask myself, well, suppose the jury, despite the flaws that you've pointed out in that confession, chose to believe the Hodling confession. Is that by itself something that could be a sufficient evidentiary basis under all these layers of deference that we work with to support a conviction? So, in other words, are we looking at the kind of case where it's not really so much a sufficiency problem, it's a completeness problem? Did the jury hear everything they should have heard, or are we looking at a case where there just is nothing that supports, that would support a rational jury in ruling as it did? Well, the answer, Your Honor, respectfully, is both. You know, that's the issue in the direct appeal, or the main appeal that Ms. Silverity will answer, but focusing specifically on the sufficiency issue. What Jackson tells us, and what this court in long holds, is you have to look at the record as a whole. You have to make a holistic, qualitative assessment of the record, which is what I can tell from your questioning, is exactly what you're doing. You don't look at one thing in isolation. So, I think when you start off with Mr. Hodling's May 2001 statement, you go through and you dissect it, and you can see that it's not probative. It by itself is not reliable. I think your analysis... So, you're saying that a rational jury, with nothing in front of it, that Hodling's statement simply couldn't convict? I'm saying, I am saying that, Your Honor. When you throw in with it, though, the fact that reliability, and given all of the layers of deference that we have, that makes it different from just having the statement alone? No, Your Honor. I don't think that's the case. Because that's really what you're... We can't re-weigh credibility. It sure seems to me, if I were sitting on the jury here, that there had been reasonable doubt raised by the DeSico group's involvement. But that's not what we're here to do. We're not here to reassess credibility. We look at the reliability when looking at what came in. And here you have Hodling's statement, and you have his testimony in the second trial that he recanted on cross-examination. But you have on top of that, the fact that he actually pled guilty and served a 20-year sentence, or was sentenced to 20 years for it. Doesn't that tip the scale under a Jackson analysis? No, Your Honor, for two reasons. First of all, the guilty plea is not itself probative. After he gives that statement in May of 2001, he's stuck. He's stuck with that statement. And I know the court understands, and you serving as a trial judge, Your Honor, you know that sometimes the evidence is enough to convince somebody that they need to take a plea rather than take the risk. That's what our plea bargain system is about. But number two, Your Honor, and I think this is very important, you have to make a holistic assessment of the record. It's not just whether the jury believed the DeSico evidence more or the Hodling evidence more. The question is whether the DeSico evidence necessarily creates in a rational juror a reasonable doubt. And if you look, for example, in the Tanner case that we cited, I believe it's the Ninth Circuit, although I may be confusing, it's the Sixth Circuit, the fact that there was just blood on the unexplained blood on the victim's shirt was enough for them to conclude. There was no explanation for it that under Jackson, the conviction couldn't be affirmed. Where's the line of looking at this holistically and looking at it and reassessing and reweighing credibility? Well, I don't know the answer to that question, but I don't think you have to answer that question in this case, because let me talk briefly about what Judge Hamilton mentioned. There is no explanation in the record for why Hyland, 15 years old at the time of the crime, I don't remember exactly how long after that he confessed to the lawyer, but here is a 15-year-old repeatedly making tearful confessions to family members, to a lawyer, to his roommates. There's no explanation of that. There isn't any evidence from him or anywhere else. There's argument, that he may have wanted to get street cred, but there's no testimony of that. So I think when you have in the record something that is completely unexplained, the state has no explanation for this alternative evidence. I think you don't have to decide where the line is. You know that it hasn't been satisfied in this case. I don't, I'm going to ask to save a little bit of time for, yes, your honor. If I could just raise with you, as has been commented upon, this is just an extraordinary case. Yes, your honor. Multiple evidence of multiple confessions from both group A and group B competing for credit for the murder. I've never seen anything quite like it, with the possible exception of Chambers, where there was at least the Chambers itself, where you've got evidence of multiple confessions by McDonald in that case. And the, you know, you've got the Supreme Court saying that even though the defense was able to chip away some at the prosecution case with some evidence from McDonald, the presentation was far less persuasive than it might have been. So I guess I'm kind of struggling with the extent to which Chambers was one-off error correction and its broader principles. But I'm not sure that I've asked you a coherent question, but I'd invite a response. Well, your honor, this case is remarkable. It's remarkable in a number of ways. It went up and down twice. And what also is remarkable is as time progressed, more and more emerged in favor of the DiCicco group's guilt on this. I don't think, I will quibble, your honor, if I may, with the characterization that there were multiple confessions in the Hotelling group. That's not accurate. Mr. Hotelling is the only one who made incriminating statements and, you know, subject to the debate that Judge Wood had with the state regarding Mr. Collette's statement when he pleaded guilty. But Ms. McMullen has never confessed. On the cross appeal, if I could just ask one, the other big problem, I guess I have, and I'd like to make sure that you can address it, is I haven't found Supreme Court cases actually granting relief under the Jackson standard, let alone on habeas. And when we go back, there was a series of cases in 2010 to 2012, McDaniel, Coleman, and I think Cavazos, where the Supreme Court was summarily reversing courts of appeals for having granted habeas relief under Jackson, telling us not to parse the evidence too finely. What, if we were inclined to agree with you on the merits of the Jackson issue, what comfort would you offer us in defense of that decision when it goes to the Supreme Court? Well, your honor, I think the most compelling thing I can say here is what you yourself observed, how extraordinary this case is. I don't know whether there's a Supreme Court case that we could have cited that granted relief under this standard. I'm assuming not. I didn't do the research personally, so I'm assuming there isn't a case directly on point, because I have an excellent team who did this research. But you can see the way that your sister circuits have interpreted this standard in the Tanner case from the Sixth Circuit and the Gonzalez case from the Ninth Circuit. Those cases present far less compelling evidence in favor of reasonable doubt than this does here. I mean, it's almost an embarrassment of riches on the DeChico group case. It got better and better as time went by, and it's overwhelming. It's just not something you see. We were contacted, and the record reflects that the family members, the family members of Mr. Hyland and Ms. DeChico came in to testify against their own family members because they believed that they were guilty of the crime. This is an extraordinary case. An innocent man, the wrong guy, really the wrong guy who had nothing to do with this. He was in the area at the time, has been in jail for 19 years here. The evidence is compelling that he did not do it. There's no evidence in support of it for all the reason, no reliable evidence in support. And there is incredible, remarkable evidence that somebody else did it. And I think under those circumstances, if the court is inclined to grant a petition under the Jackson standard, this is the case that it ought to do it. There's really an injustice happening here. Mr. Jimenez-Eckman, one procedural issue, and I know we've kept you way over your time. Can you please make sure that the video of the statement of Mr. Hotelling is on file with the district court? I attempted to watch that, and it's not on file, or at least we couldn't find it. If you could just make sure it's on file so that we could get it, I would appreciate that. Your Honor, I greatly wish there was video. There's only an audio, and I believe- I misspoke. I'm sorry, the audio. Oh, okay. I misspoke. The audio was not on file. There was a docket sheet, but it was just a piece of paper. We couldn't get the audio from them. So if you could just make sure that the audio of that statement is on file, that would be great. I greatly apologize for that, Your Honor, and we will do that. And I'm glad- I am also heartened to hear that you'll listen to it because it is incredibly compelling for Mr. Smith's case. Thank you, Your Honor. I'm not sure how much time my partner has, but- I don't know, but I'll balance it out at the end so Mr. Malamud doesn't have to worry. But the three evidentiary rulings made by the trial court and affirmed by the state appellate court violated Mr. Smith's constitutional right to present a fair defense. The district court held that these evidentiary rulings were not harmless, either individually or cumulatively, and the district court was correct. With my time, I'd like to walk through the three errors and talk about why each category of evidence was essential and each exclusion not harmless. Time allowing, I'll also touch on why the first two exclusions were arbitrary. So jumping into the first evidentiary ruling, the first error was actually the set of rulings that was discussed about keeping out the evidence that the HECO group had the motive to commit the crime. The trial court excluded evidence that Rusty LeVand had taken- or excuse me, Patrick Anderson had taken Rusty LeVand to the Burrito Express to purchase drugs about a week before the crime. And as this court has already picked up on, this is critical because there was not a shred of evidence connecting Mr. Smith or any of his acquaintances to the Burrito Express or to the victim. No theory was presented as to why Mr. Smith would have decided to go out and rob this burrito shop that night. On the other hand, there was that evidence against the HECO group, and Mr. Smith sought to put it into evidence and was prevented from doing so. That exclusion was contrary to clearly established law, federal law, including chambers, homes in South Carolina, and House v. Bell. And as this court is aware from the briefing, there's the five-factor test to evaluate these kinds of exclusions, the Koopsh factors. I'm only going to talk about a couple of them that I think are really in dispute. The first being that the evidence was essential. Well, the only thing I will say, what we said in Koopsh was an attempt to distill what the Supreme Court has said. We obviously are precedent. Just to keep that clear. Yes, Your Honor. Understood. But in Koopsh, one of the factors that this court distilled from Supreme Court precedent was that the evidence has to be essential. And that criteria is satisfied here. As Judge St. Eve, I believe, was quoting from House v. Bell, the U.S. Supreme Court case that emphasized that when identity is in question, motive is key. And that court held that because motive evidence had been excluded, habeas was appropriate. That applies exactly here. The question was which group, Group A or Group B, committed the crime. And Mr. Smith sought to show that the Chico group had a reason for targeting that establishment and a motive to do so. There was no comparable evidence offered against Mr. Smith, so this was extremely essential. Furthermore, this was not harmless error. For harmlessness, as was discussed, the standard is whether this had a substantial and injurious effect in determining the jury's verdict. And that there's no possibility for fair-minded disagreement on that. Let me ask you this. What about the Illinois Appellate Court's concern that allowing this evidence in would have led to a sideshow on the victim's drug dealing and other sorts of things that were somewhat far afield from the question, who committed this murder? Well, respectfully, as this court has already pointed out today, this was actually not far afield because the question was, who committed this crime? And this evidence went to showing that because it went to showing that the Chico group had a connection. So it wasn't far afield at all. I think that was just incorrect and the appellate court was being unreasonable there in not looking at the importance of this to the defense. Even if the court thought there was some small possibility for confusion, it had to weigh that against the right of this criminal defendant to present compelling evidence showing that another group of people had committed this and arbitrary. There can be no fair-minded disagreement here about the fact that it was injurious to the jury to not have this evidence in front of them. This jury deliberated for three days considering all of this evidence carefully. Any shred could have tipped the scales, but this was critical. This wasn't just a shred of evidence. This was paradigmatic mode of evidence that the U.S. Supreme Court has said is incredibly important and should not be excluded. So excluding this left the jury without critical information showing how all the puzzle pieces fit together for the Chico group in a way that they didn't for Mr. Smith. And another U.S. Supreme Court case, Old Chief, says that evidence has a force on any linear scheme of reasoning. As its pieces come together, a narrative gains momentum. Well, keeping this out hampered that narrative and cut off that momentum. So I'd like to move on to the second category of evidence that was excluded, and that was Adam Hyland's confession to the criminal defense attorney. His roommate, Trumbull, was with him during that meeting and would have testified not only that the meeting occurred, that Hyland went there, but that he actually confessed to that attorney. I assume, by the way, Ms. Siliberte, you know, I kept thinking, who is this attorney? But I presume that the attorney himself would have claimed attorney-client privilege for anything that Hyland said to him. I think that's not correct here because Daniel Trumbull, the roommate, was part of that meeting. But nobody ever calls the attorney to corroborate this confession, but I take it everyone agrees that it happened? The attorney was not called, and that evidence is not in the record. But in addition to the fact that Trumbull was present, this was also in a public restaurant, so there would have been no privilege for that reason as well. The exclusion of this evidence was contrary, again, to Chambers, Holmes, and Crane v. Kentucky. Jumping into why this category of evidence was essential, Ms. Port also already picked up on this, but the reason is the state's proffered explanations for all the other confessions by the members of the Chico group did not apply to this one. Dallas to Chico, Adam Hyland, Rusty LeVan, they confessed numerous times to their friends and relatives, and the state tried to say this was either bragging to get street credibility or to get sympathy or to get lenience for other crimes. But none of those explanations applied to this one. Hyland was 15 at the time. He was scared. He had tearfully confessed to this friend who said, I know of a criminal defense attorney. He then took the step to go out and meet with that attorney. The state tried to argue that the whole meeting was just prompted by this roommate, but Hyland didn't have to go along with him. He went. He sought out this attorney to get legal advice because he was scared that he was going to jail. And then, furthermore, he confessed to that attorney, which he would have had no reason to do if he had not been involved. Hyland, under no account, was the trigger man anyway. He confesses about the incident. But where was the evidence that when Hyland came back that night, he was banged up, you know, that his hand was hurt, right? So we have that on Hyland and not on Hodling. That's correct, Your Honor. The record evidence showed that there was a struggle, actually two struggles, first between Pardo and the man with the green jacket, and then between the victim and the man with the green jacket. And there was record evidence that Hyland had all those scrapes and cuts on his arms and bandages, and that he eventually confessed that those were from this struggle during the robbery. There was nothing like that presented against Mr. Smith or any of his accomplices. They were at a party the rest of the night, and none of the people at the party noticed anything amiss on them. They were cool as cucumbers. So Your Honor has identified another compelling point towards the Chico vote. Ms. Silberte, could I ask you a quick follow-up about the Hyland confession? In the passage where Trumbull is testifying, and the court excludes this, or at least limits sharply what can be said about it, not a lot of that additional detail is proffered. Are there other places in the record where there was a more detailed proffer of what Trumbull would have testified to if allowed? Your Honor, I'd have to actually go back and check on that. I believe the proffer for him was done around that same time. I could be wrong, but I'd be happy to check and submit supplemental authority on that. But I think what was offered, though, is enough to establish that he would have testified about this meeting with the attorney. And this was also corroborated by Chico, who mentioned in one of her confessions that Adam Hyland had met with an attorney. The state actually tries to point to that statement by Chico and say that Trumbull's testimony would have been cumulative, but that's actually not the case. Chico just mentioned that she believed Hyland had met with the attorney, but that's not the same as someone who was there and present for and part of that meeting and would have testified not only that Hyland went there, but that he actually confessed to the attorney. Is this a confession that makes the difference, or the fact that he was concerned enough that he went to an attorney to seek legal advice that gives credence to the reliability of the confession to his friends? It is the fact that the attorney was there. There was other evidence presented of Hyland's confessions, so it's the point that it was done to an attorney, that he sought out this attorney to seek legal advice, that while the state has tried to argue that this did not increase the chances of Hyland's legal jeopardy, it at least shows the seriousness that he perceived himself of this situation, that he perceived this situation to be. So why wouldn't, given that to Chico's testimony, that Hyland went to see a lawyer be sufficient for you to argue that before the jury? Because Chico wasn't there. She didn't know what he said to the attorney. She was hearing second hand that he had gone, but Daniel Trumbull would have testified that he was there during that meeting and that Hyland actually confessed. Excuse me, but are you saying then that the excluded testimony, I mean, you could see an attorney about different things, but it's the excluded testimony that ties it down directly to this incident, this confession, this acceptance of responsibility? That's right, Your Honor, and also that the point had been raised that he might have gone out to seek an attorney just based on rumors that were going around that he was involved and that he was innocent, but he just might have wanted to talk to an attorney. But Trumbull would have said, no, that wasn't the case. He didn't sit down to say, hey, you know, I'm innocent, rumors. He said, I did it. I was part of this crime. I was with Rusty Levan, and he confessed those details again. So the exclusion of this was not cumulative and it was not harmless in this case. The jury was deliberating for three days. It looks like my time's running short, but I did want to touch on the impeachment evidence with respect to the green jacket, just that this was the only physical evidence that the state presented to try to connect Mr. Smith to the crime. And so he should have had a full and fair opportunity to attack that, including through actually making the record that the eyewitness had given a different description on the night of the crime. I see that I'm out of time there. All right. Well, thank you very much. And Mr. Malmute, I'm trying to figure out what to do. I think you had originally asked for five minutes rebuttal, so I'll just give you your five minutes rebuttal, and I think that should balance the scales. Thank you, Your Honor. I appreciate the opportunity. I'll just try my five minutes to make a couple quick points on the main appeal and a couple quick points on the cross appeal. First, with respect to Judge Hamilton's question about Chambers, it's instructive to look at Chambers. In Chambers, there was the exclusion of three witnesses based on the state's voucher rule as well as hearsay rules. And so the defendant in that case was completely excluded from presenting testimony by three witnesses that another person had confessed to having committed the crime. Here, of course, the issue is... In that case, he did, however, put in Chambers' confession to Chambers' lawyers as well as his later retraction. So some of that evidence was in front of that jury. That's right. There was some evidence, but he had three separate witnesses who were completely excluded from being permitted from testifying. Here, there's really nothing like that. The petitioner had several, and eight witnesses, I believe, who testified that some member of the DiCicco group had confessed. There's no person that they wanted to present who would have testified with respect to a conviction that wasn't allowed to present such testimony. So it's really not like Chambers where whole of evidence, and maybe, petitioner argues, and maybe the court has some disagreement about how important those bits were, but it's really unlike Chambers in that sense. And it's a good comparison to see whether the evidence in this case that was excluded really rises to the kind of evidence that the Supreme Court has said would be a violation of constitutional right. With respect to the motive, again, the petitioner, again, was allowed to present evidence that this other group was in the neighborhood looking for a way to obtain more drugs. Multiple people testified that they were looking to rob the restaurant to obtain more drugs, to get money to obtain more drugs. The restaurant is, you know, close to where they are. There's really no explanation, you know, or an idea that they need some kind of special motive to rob this place as if they had, you know, come in from some distant locale to rob the Burrito Express. Mr. Malamuth, in a trial, in a hypothetical trial of the of somebody in the DeSico group for involvement in this robbery and murder, do you think the prosecution would have been entitled to put in that prior meeting with the victim? I'm sorry, can you repeat the question, your honor? I'm just trying to turn this around. If the state were trying to prosecute somebody from the DeSico group for this crime, do you think the defense could keep out the Anderson testimony on relevance grounds? I don't know, your honor. They would certainly have the opportunity to try. And the question is whether... I can't imagine a trial judge keeping that out. Well, the question is, again, whether the state court is objectively and reasonable in finding this harmless, even if it was air. And then turning quickly to the issue of evidence. At first, just a quick clarification. We also stated that Hodling mentioned that they're unprompted. There was a... the only petitioner had carried the gun, in addition to which way he went, that only petitioner had carried the gun, and it was a little 22. And the evidence that defend... the petitioner thinks is so compelling actually turns out not to be compelling. So, for instance, with respect to the gun, there is this 22 that cannot be excluded. But a firearms expert testified that it would be extremely difficult for anyone other than an expert marksman to fire this 22 the way witnesses described it as it being fired, because it was a single action as opposed to a double action revolver. So, the forensic evidence actually doesn't support it. The same with Mr. Hyland's confession. So, there's this... But there's no testimony that Mr. Smith is an expert marksman with 22s. Not that I saw. Well, exactly, Your Honor. And... but there are 20... Why is the fact... I mean, maybe somebody just said it was a 22, because that's actually one of the most common guns out there. Well, there are... there are double action 22s. So, there are single action 22s and double action 22s. And a double action 22 would be able to fire this way, whereas a single action wouldn't. I mean, in fact, also the McMullen testified that she saw Mr. Petitioner with a 22. Okay, I think we're going to need to wrap this up now. I see I'm out of time. Thank you, Your Honor. Sorry, where did... where did McMullen say that? That was actually the... the Petitioner's counsel was questioning the officer about the origin of why they were... why they believed that these people had committed the crime and why they were looking. And the officer responded that McMullen had told them it was a 22. I could see if I could... That was admitted? It's hard to imagine. Well, the Petitioner elicited the question. It was a response to a Petitioner's counsel question. Who was the officer who was testifying? We'll look it up. I believe that was... let's see. I'm sorry, I don't see it right here. But I believe that was Rogan who testified to that effect. Thank you. So thank you, Your Honor. So thank you all and special thanks to Mr. Jimenez-Eckman and Ms. Siliberti for representing your client. The Court always appreciates these efforts. Thanks as well to the students. Thank you, Your Honor. We'll take the case under advisement.